Nelson v. Alliance Hospitality Mgmt., LLC, 2013 NCBC 2.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
11 CVS 3217

KENNETH E. NELSON,

        Plaintiff,

        v.

ALLIANCE HOSPITALITY
MANAGEMENT, LLC, a Georgia
limited liability company, ROLF A.
TWEETEN, and AXIS HOSPITALITY,
INC., an Illinois corporation,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER AND OPINION**

{1}    THIS MATTER is before the court on Defendants' Motion for Summary Judgment ("Motion"). For the reasons stated below, the Motion is DENIED.

*Meynardie & Nanney, PLLC by Joseph H. Nanney for Plaintiff Kenneth E. Nelson.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP by Michael W. Mitchell and Jackson Wyatt Moore, Jr. and Leader, Bulso & Nolan, PLC by Eugene N. Bulso, Jr. for Defendants.*

Gale, Judge.

## I.    INTRODUCTION

{2}    The Motion calls upon the court to determine under Georgia law whether Plaintiff Kenneth E. Nelson ("Nelson") is a Member of and the extent of his ownership interest in Alliance Hospitality Management, LLC ("Alliance"). Asserting claims which in part depend upon his status as a Member, Nelson alleges that the majority owner of Alliance, Defendant Axis Hospitality, Inc. ("Axis"), which

is completely owned by Defendant Rolf A. Tweeten ("Tweeten"), misuses its control over Alliance for Tweeten's personal benefit and retains proceeds from the sale of a substantial portion of Alliance's assets under the ruse of continuing a business that can no longer be profitably maintained. Nelson's claims for breach of fiduciary duty, constructive fraud, and dissolution depend upon Nelson being a Member of Alliance. Defendants' Motion asserts that if Nelson was ever admitted as a Member, he ceased being a Member because he is insolvent. Defendants' Motion also seeks a determination adverse to Nelson's request for a declaratory judgment that he owns ten Membership Interest "Units," which would presently equate to a 16.4% ownership interest in Alliance, asking the court instead to declare that Nelson owns only a fixed 10% Membership Interest. Defendants contend that the Membership Interest Units Nelson claims required majority approval of a duly constituted Board of Directors, which has not been secured.

{3}     As explained below, the court determines that these various issues depend upon the resolution of disputed material facts.

## II.     PROCEDURAL HISTORY

{4}     Nelson initiated this lawsuit on February 25, 2011, and filed an Amended Complaint on June 1, 2011, bringing claims for (1) breach of fiduciary duty; (2) constructive fraud; (3) judicial dissolution of Alliance; (4) a declaratory judgment that Nelson owns ten of Alliance's sixty-one outstanding Membership Interest Units; and (5) wrongful termination. The matter was designated as a Complex Business Case by Order of Chief Justice Sarah Parker dated March 22, 2011, and assigned to the undersigned on March 24, 2011.

{5}     On February 28, 2011, Defendants filed their answer and counterclaim. On April 11, 2011, Defendants filed an amended counterclaim, and filed a second amended counterclaim on July 11, 2011. In their second amended counterclaim, Defendants brought claims for a declaratory judgment, or in the alternative, reformation of the document titled as Admission of New Member,

seeking to limit Nelson's ownership interest to a fixed 10%. (2nd Am. Countercl. ¶¶ 47–58.) Defendants also brought counterclaims for negligent misrepresentation, constructive fraud, and breach of fiduciary duties by Nelson. (2nd Am. Countercl. ¶¶ 59–76.)

{6}     On July 29, 2011, Nelson filed a Motion to Dismiss Counts III and IV of Defendants' Second Amended Counterclaim ("Plaintiff's Motion to Dismiss") and Defendants filed a Motion to Dismiss Plaintiff's First, Second, Fourth, and Fifth Claims ("Defendants' Motion to Dismiss"). On November 22, 2011, the court denied Plaintiff's Motion to Dismiss, granted Defendants' Motion to Dismiss as to Nelson's wrongful termination claim, and denied Defendants' Motion as to Nelson's other claims.

{7}     Axis dismissed its counterclaims on February 15, 2012. Tweeten and Alliance dismissed the remaining counterclaims on August 28, 2012.

{8}     Defendants filed the Motion now before the court on September 13, 2012. The Motion has been fully briefed, the court heard oral argument on November 20, 2012, and the matter is ripe for disposition.

## III.     STATEMENT OF FACTS

{9}     The court does not make findings of fact when ruling upon a motion for summary judgment. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975). The court believes the following facts are either uncontested or, if contested, have been construed in favor of Nelson who opposes the Motion.

A.     Nelson's Involvement in Alliance

{10}     Alliance is a Georgia limited liability company that provides hotel management services. (Am. Compl. ¶ 20.) Axis is an Illinois corporation with its principal place of business in Wake County, North Carolina, and is owned solely by Tweeten. (Am. Compl. ¶ 12; Answer to Am. Compl. ¶ 12.)

{11}    In the summer of 2007, Tweeten sought Nelson's assistance in negotiating Axis' potential acquisition of Alliance. (Nelson Dep. 10:16–12:1, 21:20–22:8, July 31, 2012.) Axis acquired the majority Membership Interest in Alliance later that same year. (Am. Compl. ¶¶ 2, 21.)

{12}    Throughout the remainder of 2007 and 2008, Nelson worked part-time for Alliance, commuting between Alliance's office in Raleigh, North Carolina and Nelson's home in Milwaukee, Wisconsin. (Am. Compl. ¶ 30.) Early in 2008, Tweeten and Nelson orally agreed that Nelson would receive a 10% Membership Interest in Alliance. (Nelson Dep. 39:9–43:5; Reply in Further Supp. of Defs.' Mot. for Summ. J. (hereinafter "Reply") 6.) Nelson was made one of three Directors of Alliance on or before February 29, 2008 when the Amended and Restated Operating Agreement of Alliance Hospitality Management, LLC ("Operating Agreement") was adopted. (Tweeten Aff. Ex. 1, Sept. 12, 2012.) Before the Operating Agreement was adopted in February, 2008, Alliance did not measure its Membership Interests in Units but in ownership percentages. (Nelson Dep. 120:8–19, July 31, 2012.)

{13}    The issues in the case turn in large part on two documents: the Consent Resolution adopted in 2009 and the document entitled Admission of New Member executed in 2010, and whether they in combination constitute valid corporate action required to grant Nelson the rights he claims.

{14}    In 2009, Nelson moved from Wisconsin to North Carolina to work full-time for Alliance. (Am. Compl. ¶¶ 30–33.) Before committing to do so, Nelson requested a writing evidencing his Membership Interest in Alliance. (Am. Compl. ¶ 31.) On June 3, 2009, Tweeten and Nelson, as Directors, signed the Consent Resolution which states:

> We, the directors of Alliance Hospitality Management, LLC (the "Company"), do hereby resolve that ten (10) Membership Interest Units of the Company shall be issued to Kenneth Nelson to compensate him for his ongoing services and contributions to the Company from August 2, 2007. Such units shall be issued at such time as the litigation between the [sic] Keith Hansen, Rolf Tweeten, and Axis Hospitality, Inc. is ended.

(Nelson Dep. Ex. 12, July 31, 2012.)

{15} In September 2010, Nelson informed Alliance that the State of Michigan needed "a document showing the date upon which [Nelson] acquired [his] interest in Alliance" for purposes of obtaining a liquor license. (Nelson Dep. 86:16–25, 141:14–142:16, July 31, 2012.) Nelson then drafted the document titled Admission of New Member and presented it to Tweeten. (Nelson Dep. 141:14–143:10.) On September 24, 2001, the document was signed by Nelson and twice by Tweeten, once on behalf of Axis and again as chairman of Alliance. (Nelson Dep. Ex. 17, July 31, 2012.) At that time, Axis was the majority owner of Alliance. The Admission of New Member document states:

> Whereas, Axis Hospitality, Inc. . . . is the holder of a majority of the membership interests of Alliance; and,
>
> Whereas, Axis wishes to give its consent to the admission of Nelson to Alliance; and . . .
>
> Therefore, they do hereby agree as follows:
>
> 1. Nelson is admitted to Alliance and is the holder of ten (10) membership interests (sometimes called units) of Alliance.
>
> 2. Axis does hereby give the consent required, by Section 8.1 of the Operating Agreement, for the admission of a member to Alliance . . .

(Nelson Dep. Ex. 17, July 31, 2012.) The document recites that its effective date was March 23, 2010, the day after the litigation with Keith Hansen ("Hansen") referred to in the Consent Resolution was resolved by a settlement agreement. (Nelson Dep. Ex. 17, July 31, 2012.)

{16} The Parties dispute whether either the Consent Resolution or the Admission of New Member document was adopted by a valid act of a majority of Alliance's Board of Directors.

B.    Hansen's Resignation From Alliance's Board of Directors

{17}    Section 2.1 of the Operating Agreement defines the Board of Directors ("Board") to be the Directors collectively acting in their capacity as Managers, and that the Board only acts through an act of a majority of the Directors.  Section 3.3 of the Operating Agreement provides that the "Company shall at all times have three (3) Directors," and that the three Directors would be two designated by Axis and one designated by Hansen so long as Hansen owned not less than a 15% Membership Interest.  Section 3.4 of the Operating Agreement provides that a majority of the Directors would constitute a quorum and that "the consent of a majority of the Directors present at the meeting shall be deemed the act of the Board of Directors." Section 3.5 of the Operating Agreement provides that the Board can take action by written consent without a meeting so long as the writing was signed by those Directors that could have taken action at a Board meeting.  Section 3.6 of the Operating Agreement provides that a Director may resign as a Director upon written notice to Alliance, and unless specified otherwise in such notice, the acceptance of the resignation is not necessary to make it effective, and further that a vacancy would be filled by the person who had the power to designate the resigning Director.

{18}    When the Operating Agreement was adopted in February 2008, the three Directors of the Board of Directors of Alliance were Nelson and Tweeten, designated by Axis, and Hansen, who designated himself.

{19}    On June 27, 2008, Hansen sent an e-mail to Nelson and Tweeten announcing his resignation from the Board of Directors.  (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. (hereinafter "Mem. in Opp'n") 5.)  Hansen's e-mail did not designate a replacement Director.

{20}    Hansen remained a Member of Alliance until April 2010 when Alliance purchased Hansen's entire Membership Interest.  (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. (hereinafter "Mem. in Supp.") 6; Am. Compl. ¶¶ 29, 34.)  On

November 1, 2010, Carrie Tweeten was elected to replace Hansen on the Board of Directors. (Tweeten Aff. Ex. 2, Sept. 12, 2012.)

{21}    Nelson contends that Hansen effectively resigned as a Director through his June 2008 e-mail and that the Board could act with only two Directors. Defendants contend alternatively that either Hansen remained a Director until he was replaced by Carrie Tweeten on November 1, 2010, or that Hansen's e-mail resignation rendered Alliance's Board without power to act until a new Director was elected to replace Hansen. (Mem. in Supp. 6–7; Reply 7–8.)

C.    Other Provisions of the Operating Agreement

{22}    Section 8.1 of the Operating Agreement vests the ability to admit new Members with the Members themselves, not with the Board of Directors. A person may only be admitted as a Member of Alliance with the written consent of a Majority in Interest of the Members.

{23}    However, the Board of Directors is specifically given the power to, among other things, "issue additional Membership Interests in the Company." (Operating Agreement § 3.1.12.) Before issuing additional Membership Interests, Section 3.1.12 of the Operating Agreement requires the Board to first offer current Members the opportunity to purchase additional Membership Interests to allow them to maintain their current percentage ownership (the "anti-dilution provision").

D.    The Interstate Transaction

{24}    In 2010, Tweeten and Nelson explored the possible sale of all or a portion of Alliance's assets, and held related negotiations with third parties including Interstate Hotels & Resorts, Inc. ("Interstate"). (Am. Compl. ¶¶ 37–38, 41; Brief in Supp. of Defs.' Mot. to Dismiss Pl.'s First, Second, Fourth, and Fifth Claims for Relief 3.)

{25}    On January 28, 2011, Alliance and Interstate entered into a Purchase Agreement (the "Interstate Transaction"), in which Alliance sold the right to

manage thirty of the approximately fifty hotels Alliance previously managed to Interstate for $8,500,000.00 ("Sale Proceeds"). (Brief in Supp. of Defs.' Mot. to Dismiss Ex. C, at 1, 4; Am. Compl. ¶ 47.)

{26} On May 11, 2011, Nelson requested a distribution of the Sale Proceeds pursuant to § 7.3 of the Operating Agreement. (Am. Compl. ¶ 61.) No distribution of the Sale Proceeds has occurred to date. Nelson contends that, as a result of the Interstate Transaction, Alliance can no longer be profitably operated and that dissolution is therefore necessary to prevent the erosion of the remaining Sale Proceeds by Alliance's continuing operating losses.

## IV.  LEGAL STANDARD

{27} Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law. N.C. GEN. STAT. § 1A-1, Rule 56(c); *Andresen v. Progress Energy, Inc.*, 204 N.C. App. 182, 184, 696 S.E.2d 159, 160–61 (2010).

## V.  ANALYSIS

{28} The issues raised by the Motion divide into two categories: first whether Nelson has standing to bring certain claims as a Member of Alliance; and second, the extent of Nelson's ownership interest in Alliance. Nelson's ownership interest does not depend upon his being a Member; a person may acquire an ownership interest in Alliance without becoming a Member, and, likewise, a person may become a Member without acquiring an ownership interest. (Mem. in Supp. 5–6, 17 n.7.) As to Nelson's status as a Member, the court must address first whether he was ever made a Member, and if so, whether he ceased to be a Member because he is insolvent. As to Nelson's ownership interest, Nelson claims he was awarded Membership Interest Units, which give him a proportional interest to be determined by the total number of outstanding Units, whereas Defendants contend

Nelson owns no actual Membership Interest Units but is entitled to a fixed 10% ownership interest because of an oral promise made to him by Tweeten and by which Alliance has abided.

{29} Defendants' Motion asserts that because Nelson is not a Member, he has no standing to bring his claims for breach of fiduciary duty, constructive fraud, and dissolution. In particular, Defendants contend that Nelson has no standing to assert a breach of fiduciary duty against Alliance for refusing to distribute the Sale Proceeds because only a Member is entitled to distributions, (Operating Agreement § 7.3.), that Nelson's constructive fraud claim based on the same refusal to distribute the Sale Proceeds must also fail, and that under Georgia law only a Member may seek a judicial dissolution. GA. CODE ANN. § 14-11-603 (2012).

{30} Defendants acknowledge that Nelson should receive the benefit of Tweeten's oral promise of a 10% ownership interest, but contend that Nelson has not been granted Membership Interest Units by the action of a majority of disinterested Directors.

{31} The court's analysis is governed by the Georgia LLC Act, except where modified by Alliance's Operating Agreement. *See* GA. CODE ANN. § 14-11-1107(i), (l) (2012).


A.	Nelson's Status as a Member of Alliance

1. *The Admission of New Member document reflects the consent of the owner of the Majority in Interest, the only action necessary for Member admission.*

{32} Section 8.1 of Alliance's Operating Agreement governs the admission of new Members, and provides:

> 8.1.	Restrictions on Transfer. Without the prior written consent of a Majority in Interest of the Members . . . (b) no Person may be admitted to the Company as a Member.

 (Operating Agreement § 8.1.)

{33} At all relevant times, Axis has held a Majority in Interest in Alliance. (Mem. in Supp. 17 n.8.) The Admission of New Member document is signed by

Tweeten on behalf of Axis. The document expressly states that Nelson is "admitted to Alliance" and that Axis "hereby give[s] the consent required, by Section 8.1 of the Operating Agreement, for the admission of a member to Alliance." Axis' consent was all that the Operating Agreement required to admit Nelson as a Member.

{34}    The court does not accept Defendants' argument that the anti-dilution provision of the Operating Agreement effectively precludes the admission of new Members. First, that provision can be waived by the existing Members. Second, neither the Georgia LLC Act nor the Operating Agreement requires that a Member have any ownership interest in Alliance, so admitting a Member does not necessarily implicate the anti-dilution provision. GA. CODE ANN. § 14-11-505(e) (2012); (Mem. in Supp. 17 n.7.)

{35}    The court concludes as a matter of law that the Admission of New Member document reflects the act necessary under the Operating Agreement to admit Nelson as a Member of Alliance. The question then arises whether Nelson ceased to be a Member because of insolvency.

2.  *Disputed material issues of fact preclude determining whether Nelson ceased to be a Member by reason of insolvency.*

{36}    Defendants contend that even if Nelson was made a Member of Alliance, he ceased being a Member and has only the powers of a Transferee because he is insolvent. Nelson challenges Defendants' definition of insolvency and further asserts that there are material issues of fact under the standard Defendants propose.

{37}    The Operating Agreement provides:

> 4.6    Bankruptcy or Incapacity of a Member. A Member shall cease to have any power as a Member or a Manager . . . upon death, bankruptcy, insolvency, dissolution, assignment for the benefit of creditors, or legal incapacity . . . [and] upon the occurrence of any such event shall have only the rights, powers, and privileges of a transferee enumerated in Section 8.4.

8.4 <u>Rights of Transferee.</u> Unless admitted to the Company in accordance with Section 8.3, the transferee of a Membership Interest . . . shall not be entitled to any of the rights, powers, or privileges of its predecessor in interest, except that such transferee shall be entitled to receive and be credited with its proportionate share of Profits, Losses, Gains from Capital Transactions, Company Cash Flow, Company Sales Proceeds, Company Refinancing Proceeds, and Distributions in liquidation.

(Operating Agreement §§ 4.6, 8.4.) The term "insolvency" is not defined in the Operating Agreement, the Georgia LLC Act, or case law that the court has been able to find.

{38} Defendants assert that insolvency is the status which exists whenever a person either cannot pay his debts as they come due or when the person's liabilities exceed his assets. (Mem. in Supp. 17–18, 18 n.9.) Nelson asserts that such a "status" definition is both improper and unworkable because such a status could change from day to day on the vagaries of certain events, such as movements in the stock market or other indices. (Mem. in Opp'n 23–24.) Nelson asserts that the proper standard to interpret § 4.6 should require a triggering event, in harmony with the other events enumerated in § 4.6, such that a Member would not be deemed insolvent until he is actually divested of possession of his property. (Mem. in Opp'n 21–23.)

{39} Nelson contends that material facts remain in dispute under either standard. Defendants' construction of the evidence is as follows:

Liabilities:
- $4 million judgment against Nelson ordered by the U.S. District Court for the District of South Carolina.
- $150,000.00 debt to Michael, Best & Friedrich, LLP.
- $100,000.00 owed to Nelson's wife, Susan Nelson.

Total = $4,250,000.00

Assets:
- $850,000.00 for Nelson's 10% Membership Interest in Alliance (10% of the $8.5 million Sale Proceeds).
- $0.00 for Nelson's alleged claims against Defendants in this action.
- $0.00 for Nelson's disputed interest in 664 N. Michigan, LLC.

- $50,000.00 to $100,000.00 in liquid assets.
  Total = $900,000.00 to $950,000.00

(Mem. in Supp. 18–19.)

{40}    The court concludes that there are factual issues inherent in Defendants' evidentiary presentation.  The extent of Nelson's Membership Interest in Alliance is as of yet undetermined, and the value of Nelson's claims against Defendants can only be determined at trial.

{41}    The court is dubious about Nelson's testimony that he owns any ownership interest in 664 N. Michigan, LLC based on other testimony, but that doubt is more properly construed as a question of fact.  Defendants also allege that Nelson is insolvent as he is unable to pay his debts as they come due, evidenced by his failure to pay the $4 million South Carolina judgment.  (Mem. in Supp. 19.) Nelson indicates that he contests the South Carolina judgment and that he has failed to pay that debt to date only because of his legal challenge.  (Mem. in Opp'n 25.)  While again the court may have doubts as to this testimony, this is an issue for trial. [1]

B.    The Extent of Nelson's Ownership Interests in Alliance

1. *Defendants acknowledge that Nelson owns a fixed 10% ownership interest in Alliance.*

{42}    Defendants contend that new Membership Interest Units can be created after execution of the Operating Agreement only by a majority of a duly constituted Board, and further that even such a majority cannot grant Membership Interest Units if doing so would violate the anti-dilution provision of the Operating Agreement.  Defendants contend that neither of these conditions precedent to granting the interest Nelson claims have been satisfied.

---

[1] The Court also notes that there is a question under the evidence whether Nelson was insolvent at the time he was admitted as a Member or whether there was some event after he was admitted that would constitute an occurrence causing him to "cease" being a Member.

{43}    Defendants acknowledge, however, that Tweeten orally promised Nelson a 10% ownership interest, and that Alliance has recognized and acted in accord with Tweeten's promise, including taking judicial positions in this litigation, such that this ownership should be recognized even if valid Board action has not been taken. (Reply 6.)

2. *There are contested material issues of fact whether Nelson was granted Membership Interest Units by valid Board action.*

{44}    The question of whether the Board validly issued Membership Interest Units in Alliance is a two-step inquiry: (1) did a majority of a validly constituted Board of Directors approve the grant of Membership Interest Units; and (2) has the anti-dilution provision of the Operating Agreement been satisfied?

a.    <u>Determining whether action was taken by the majority of a duly constituted Board of Directors.</u>

{45}    The Parties dispute whether Hansen effectively resigned by delivering his June 27, 2008 e-mail to Nelson and Tweeten.  Defendants contend that Hansen did not validly resign, and so the Consent Resolution was not validly adopted because Nelson was an interested Director, leaving Tweeten and Hansen as Directors entitled to vote on the issuance of Membership Interest Units, and because Hansen did not vote, there was no action by a Board majority.[2]

{46}    Based on the uncontested facts, the court concludes that Hansen effectively resigned by his e-mail on June 27, 2008.  Section 14-11-304(b) of the Georgia LLC Act states that "[u]nless otherwise provided in the articles of

---

[2] The Georgia LLC Act provides that, in the absence of a waiver of its provisions in an Operating Agreement, an interested director cannot be counted for purposes of constituting a quorum to approve a conflict of interest transaction.  The Operating Agreement includes provisions defining a quorum based only on the total number of Directors, but does not contain any specific provisions regarding what constitutes a quorum for purposes of a conflict of interest transaction.  However, the court concludes that Hansen effectively resigned, leaving only Tweeten and Nelson as Directors.  As such, if Nelson is disqualified from participation, Tweeten would alone constitute a quorum under either the Georgia LLC Act or under the Operating Agreement, if the Operating Agreement waived the provisions of the Act even though it did not specifically refer to conflict of interest transactions. GA. CODE ANN. § 14-11-307(f); (Operating Agreement § 3.4.)

organization or a written operating agreement," a Director "shall hold office until their successors shall have been elected and qualified" *unless* they "earlier resigned." Section 3.6 of Alliance's Operating Agreement provides that acceptance of a Director's resignation is not necessary to make it effective. While the resigning Director was given the authority to nominate a replacement Director, it does not necessarily follow that the resignation was not effective until the replacement Director was nominated.[3]

{47} The court has carefully considered Defendants' argument and citation to case authority that the Board had no authority to act during any vacancy because the Operating Agreement specified that the Board shall at all times have three Directors, but the court finds the cited case law is not dispositive as to the facts of this case. (Reply 8.)

{48} In sum, the court concludes that Defendants have not demonstrated as a matter of law that the Consent Resolution and the adoption of the Admission of New Member, in combination, cannot constitute valid Board action to create new Membership Interest Units and transfer them to Nelson.

b. <u>Nevertheless, the Consent Resolution does not reflect that the anti-dilution provision was satisfied so as to allow creation of any new Membership Interest.</u>

{49} The court concludes that the uncontested facts demonstrate that the Consent Resolution was not by itself adequate to transfer ten Membership Interest Units to Nelson. As an initial matter, the language of the Consent Resolution indicates that the actual grant of any interest would be in the future, and "shall be issued" to Nelson at the conclusion of the litigation between Hansen, Tweeten, and Axis. Even if the court were to conclude, which it need not for present purposes, that the grant was "self-executing," the anti-dilution provision of the Operating Agreement was not satisfied. After the conclusion of the Hansen litigation and at

---

[3] If the court had rather concluded that Hansen was precluded from resigning until his replacement was nominated or elected, the court would then have considered whether Defendants under the facts of this case should be estopped from invoking a lack of corporate formality as a defense to Nelson's claims.

the time of the Consent Resolution Hansen remained a Member, and the Board could not grant the new Membership Interest without his waiver of the anti-dilution provision of the Operating Agreement. There is no evidence of such waiver.

c. <u>There are disputed issues of material fact whether Alliance's Board finalized any transfer of Membership Interest Units to Nelson when Tweeten joined in the executing of the Admission of New Member document on behalf of both Axis and Alliance.</u>

{50}    Tweeten signed the Admission of New Member document twice: once as the president of Axis, and once as the "chairman" of Alliance. (Nelson Dep. Ex. 17, July 31, 2012.) Only Axis was required to consent to admit Nelson as a Member; Alliance had no role in the Member admission. There was then no reason for Alliance to sign the document except for a different corporate purpose. Construed in Nelson's favor, the evidence could support the conclusion that the corporate purpose was to effectuate the transfer of Units contemplated by the earlier Consent Resolution because the condition of that resolution had been satisfied.

{51}    The Consent Resolution was signed in June 2009 and conditioned the transfer of Units to Nelson on the resolution of litigation with Hansen. That resolution occurred on March 22, 2010. (Nelson Dep. 81:7–82:1, July 31, 2012.) The Admission of New Member document was signed on September 24, 2010, but reflected a retroactive effective date of March 23, 2010. The document recites that Nelson "is the holder of ten (10) membership interests (sometimes called units) of Alliance." Alliance's joinder in the document could support the conclusion that the Alliance Board intended to finalize the transfer it had earlier approved. This construction would be consistent with Tweeten's testimony that Nelson acquired his Membership Interest in Alliance in "early 2010." (Tweeten Aff. ¶ 5, Feb. 28, 2011.)

d. <u>With Hansen no longer a Member at the time of the Admission of New Member document, only Axis needed to waive the anti-dilution provision.</u>

{52}   Viewed favorably to Nelson, the Admission of New Member document could be construed to reflect that Axis waived the anti-dilution provision of Section 8.1 of the Operating Agreement, thereby allowing the Alliance Board to issue the new Membership Interest.  Hansen was no longer a Member and the condition regarding the Hansen litigation had been satisfied.  The jury could conclude that the Board then intended to effectuate the transfer of new Membership Interests to Nelson.

## VI.   CONCLUSION

{53}   In sum, the court concludes that there are disputed issues of material fact which preclude determining the outstanding issues as a matter of law and accordingly, Defendants' Motion for Summary Judgment is DENIED.


IT IS SO ORDERED, this the 3rd day of January, 2013.